In the Matter of Robert William **KRAS**, Petitioner in Bankruptcy.

No. 71–B–972

United States District Court,
E. D. New York.

Sept. 13, 1971.

Morton Dicker and Kalman Finkel, The Legal Aid Society, New York City, for petitioner.

L. Patrick Gray, III, Asst. Atty. Gen., Washington, D. C., Edward R. Neaher, U. S. Atty., Eastern District of New York, and Mary P. Maguire, Asst. U. S. Atty., Harland F. Leathers and Jeffrey F. Axelrad, Attys., Dept. of Justice, Washington, D. C., for the United States.

## DECISION AND ORDER

TRAVIA, District Judge.

The petitioner moves for leave to file his petition in bankruptcy and proceed without prepayment of any of the filing fees [1] as a condition precedent to a discharge in bankruptcy. The motion comes directly to the Court before being referred to a Referee by the Clerk of the Court.

Under the Individual Assignment System presently operating in this District, new civil and criminal cases are filed in the Clerk's Office, given a docket number and then assigned, at random, to one Judge for all purposes. In a bankruptcy proceeding, " * * * the clerk shall, immediately *upon the filing* of a petition * * *, refer the case to a referee." [2] (Emphasis added). The issue in this proceeding is whether the Clerk shall file the petition without the payment of the filing fees. Since the Clerk has not filed the petition, the matter has not been referred to a referee and the issue is before this Court.[3] A decision granting the motion will, in effect, direct the Clerk of the Court to file the petition, assign the same a docket number and refer the proceeding to a Referee in Bankruptcy. A decision denying the motion will end the proceeding without giving the petitioner an opportunity to an adjudication of his rights in a bankruptcy proceeding.[4]

According to his affidavit submitted in support of the motion,[5] petitioner lives in a two and one-half room apartment with his wife, his two young children, his mother, and her young child. His younger child has cystic fibrosis and, at about the time the affidavit was prepared, was in Cumberland Medical Center. Except for some minor odd jobs, petitioner has been unemployed since May 1969. His last steady employment was as an insurance agent for Metropolitan Life Insurance Company (hereinafter "Metropolitan") from which he was discharged because premiums which he had collected were stolen from his home and he was unable to make up the amount. Petitioner has since attempted to secure employment but has been unsuccessful because of bad references given by Metropolitan. Petitioner's wife was employed until March 1970 when she had to stop working because of her pregnancy. She will be unable to work since all of her time will be spent caring for the younger child.

Petitioner's present financial picture is not pleasant, to say the least. He and his family, including his mother and her daughter, live on a public assistance allotment of $366.00 per month. All of this amount is required for rent and the necessities of life. Petitioner alleges he owns no non-exempt assets and that his only assets consist of $50.00 worth of essential household goods and clothing which are exempt from distribution under 11 U.S.C. § 24 and New York CPLR § 5205(a). Because of these circumstances, petitioner claims he is unable

---

1. Such fees are presently required by the Bankruptcy Act, 11 U.S.C. §§ 32(b) (2), 32(c) (8), 68(c) (1), 95(g) and U.S. Supreme Court General Order in Bankruptcy 35(4).

2. Bankruptcy Rule 2(a) E.D.N.Y.

3. The Court's research indicates that this is the first proceeding involving this issue which has not first been presented to a referee for decision. See In re Garland, 428 F.2d 1185 (1st Cir. 1970), cert. denied, 402 U.S. 954, 91 S.Ct. 1624, 29 L.Ed.2d 124 (1971); In Matter of Smith, 323 F.Supp. 1082 (D.Colo.1971); A. Richard Partilla, Bankruptcy No. 71–B–380 (S.D.N.Y., pending before Referee Babitt).

4. Of course, such a decision would not affect whatever appellate rights petitioner might have.

5. Since the factual allegations in the affidavit have not been challenged, they will be accepted as true.

to pay the filing fee and cannot promise to pay the fee in installments.[6]  Neither the New York City Department of Social Services nor family, relatives, or friends have been able to help petitioner raise the money to meet the cost of filing the petition.  Petitioner seeks a discharge in bankruptcy of his indebtedness in the amount of $6,428.69 and states as his reason, among other things, " * * * in order to get a new start in life." [7] He especially seeks a discharge of his indebtedness to Metropolitan to improve his chances of securing employment elsewhere.

To secure relief, petitioner makes both statutory and constitutional arguments.[8] In view of the long established practice of refraining from passing on the constitutionality of Acts of Congress unless compelled to do so, Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936, Brandeis, J. concurring), petitioner's statutory claim will be dealt with first.

I

Petitioner argues that the Bankruptcy Act should be liberally construed in view of its broad remedial purpose and that the federal in forma pauperis statute, 28 U.S.C. § 1915(a), should be applied to bankruptcy proceedings in accordance with such construction.  On its face, petitioner's argument possesses some merit.  Section 1915(a) provides:

"Any Court of the United States may authorize the commencement, prosecution or defense of *any suit, action or proceeding*, civil or criminal, or appeal therein, *without prepayment of fees* and costs or security therefor, by a person who makes affidavit that he is unable to pay such costs or give security therefor.  Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that he is entitled to redress."  (Emphasis added).

As petitioner states, "By its own terms this statute is as applicable to bankruptcy proceedings as to any other proceedings in federal court." [9]  And since the filing fee in bankruptcy, $50.00,[10] is much greater than that in other civil litigation, generally $15.00,[11] the need for the application of § 1915 to bankruptcy proceedings is obvious.  Petitioner further argues that nothing in the Bankruptcy Act or the General Orders—

"specifically requires that persons must pay the filing fee as a prerequisite to discharge even if they are so poor that they do not have at the time of filing and cannot hope to have over 9 months enough non-essential assets to pay any part of the filing fees." [12]

Except for evidence that Congress intended to require payment of

---

6.  Provision for installment payments over a period as long as nine months is made by General Order 35(4).

7.  Petitioner's affidavit, p. 3.

8.  Because of the claims of unconstitutionality, petitioner has submitted the notice required by Rule 24, General Rules, E.D.N.Y., Rule 24, applicable to cases where the United States is not a party, requires a party challenging the constitutionality of an Act of Congress to give notice of such fact to the Court " * * * to enable the Court to comply with 28 U.S.C. § 2403 * * *." Section 2403 provides for judicial certification to the Attorney General when the constitutionality of an Act of Congress is drawn in question.  This Court, by letter dated June 2, 1971, certified to the Attorney General that the constitutionality of several sections of the Federal Bankruptcy Act, viz., 11 U.S.C. §§ 32(b)(2), 32(c)(8), 68(c)(1), 95(g), and U.S. Supreme Court General Order in Bankruptcy 35(4) was drawn in question.  On July 2, 1971, the Attorney General's Office replied that it wished to intervene as amicus curiae and on August 3, 1971, submitted a brief in opposition to this motion.

9.  Petitioner's Memorandum, p. 7.

10.  The fee is $40.00 in no-asset cases.  11 U.S.C. § 76(c).

11.  28 U.S.C. § 1914.

12.  Petitioner's Memorandum, pp. 6–7.

filing fees as a condition precedent to discharge in bankruptcy, this Court might be inclined to grant petitioner's motion on the ground that § 1915(a) is applicable to bankruptcy proceedings. That evidence, however, compels this Court to reject petitioner's statutory argument.

The Bankruptcy Act of 1898 provided for a waiver of fees at the time of the filing of the petition on an affidavit of inability to pay.[13] In 1946, Congress passed the Referees' Salary Bill [14] which did away with bankruptcy petitions in forma pauperis. The Senate Report on that Bill stated:

> "Under the existing statutory provisions a bankrupt is permitted to file a petition without the payment of any filing fees where he accompanies it with an affidavit indicating his inability to pay them. In such instances, however, many of the referees have later collected the filing fees in installments from the bankrupts. It is deemed desirable, in lieu of the present widespread practice of demanding payment ultimately, to abolish pauper petitions. It seems more advisable to provide for installments in meritorious cases and to leave the exact procedure for incorporation in the general orders of the Supreme Court." [15]

Although the Senate's reasoning has been criticized,[16] it is difficult for this Court to say that Congress was unaware of the effect its action would have upon paupers' petitions. Congress knowingly deleted from the new law the former paupers' provision and substituted the requirement that a bankrupt who asserts contemporaneously with the filing of his petition that he cannot pay the fee, may pay in installments, but must pay ultimately as a condition precedent to discharge. 11 U.S.C. §§ 32(b), 32(c) (8), 68(c)(1), 95(g); General Orders in Bankruptcy 35(4), 331 U.S. 873, 877.

A similar conclusion has been reached in the two other cases which have considered this issue. In re Garland and In Matter of Smith, both *supra*, at note 3. Chief Judge Aldrich stated in the opinion of the Court, In re Garland, "Of more basic importance, Section 1915(a) provides for waiver of prepayment only, not for forgiveness. See section 1915(e). It cannot be read to eliminate a requirement of ultimate payment phrased as a condition precedent."

This Court agrees with the reasoning of the *Garland* and *Smith* cases on this issue.

## II

Having disposed of petitioner's statutory claims, the Court now turns to the more difficult constitutional questions petitioner raises.

First, petitioner argues that the provisions of the Bankruptcy Act which condition a discharge in bankruptcy upon payment of a filing fee [17] deprive him of his Fifth Amendment rights to due process and equal protection of the laws.

This issue is one of first impression in this Circuit.[18] However, two other federal courts have faced the constitutional questions. In In re Garland [19] decided on July 8, 1970, the First Circuit, in a unanimous decision, held that the constitutional requirement of payment of a filing fee before receiving a discharge in bankruptcy does not amount to a denial of due process. More recently, on February 24, 1971, the Colorado District Court

13. Ch. 541 §§ 40(c), 51(2).

14. 11 U.S.C. § 68.

15. S.Rep.No.959, 79th Cong., 2d Sess. 7 (1946), U.S.Code Cong.Service 1946, p. 1236.

16. Shaeffer, Proceedings in Bankruptcy in Forma Pauperis, 1969 Colum.L.Rev. 1203, 1211.

17. See note 1, *supra*, p. 1207.

18. Apart from A. Richard Partilla, 71–B–380, pending before a Referee in the Southern District. See note 3, supra, p. 1207.

19. 428 F.2d 1185 (1st Cir. 1970), cert. denied, 402 U.S. 954, 91 S.Ct. 1624, 29 L.Ed.2d 124 (1971).

in In Matter of Smith[20] disagreed with the conclusion of the First Circuit and found that the filing fee requirement of the Bankruptcy Act as applied to an indigent petitioner constituted a denial of equal protection. Thus, this Court is faced with conflicting judicial decisions, and since neither the Supreme Court nor our own Court of Appeals has ruled directly on the question, it is free to adopt that solution which it feels the Constitution requires.

At the outset, it should be noted that neither the *Garland* nor the *Smith* courts had the benefit of the Supreme Court's opinions in Boddie v. Connecticut,[21] decided on March 2, 1971. In *Boddie*, a majority of the Supreme Court relied on the Due Process Clause to strike down a Connecticut statute which had the effect of denying individuals access to its divorce courts solely because of the inability of an individual to pay filing fees and process costs. Since there was no dispute as to appellants' inability to pay or their "good faith" in seeking a divorce, the Court reached the constitutional issue. Speaking for the majority, Mr. Justice Harlan said:

"* * * we think appellants' plight, because resort to the state courts is the only avenue to dissolution of their marriages, is akin to that of defendants faced with exclusion from the only forum effectively empowered to settle their disputes. Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court. For both groups this process is not only the paramount dispute-settlement technique, but, in fact, the only available one. * * *"

Prior cases establish, first, that due process requires at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."[22]

In concurring, Mr. Justice Douglas preferred to base his decision on the Equal Protection Clause. Poverty was the invidious criterion Connecticut used in determining who might seek a divorce. Mr. Justice Brennan relied on both the Due Process and Equal Protection Clauses:

"Certainly, there is at issue the denial of a hearing, a matter for analysis under the Due Process Clause. But Connecticut does not deny a hearing to everyone in these circumstances; it denies it only to people who fail to pay certain fees. The validity of this partial denial, or differentiation in treatment, can be tested as well under the Equal Protection Clause."[23]

On May 3, 1971, the Supreme Court denied certiorari in *In re Garland*, three Justices dissenting.[24] Such denial may have resulted from the Court's desire to proceed "slowly step-by-step, so that the country will have time to absorb its [*Boddie's*] full import."[25] But, for whatever reason, the Court's denial of certiorari is not to be taken as a decision on the merits of the case, United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923), and this Court remains free to chart its own course. That course, however, is not without guideposts, particularly in view of the statements of Mr. Justice Black, and Mr. Justice Douglas dissenting from the denial of certiorari in *In re Garland*. Although ironically Mr. Justice Black

20. 323 F.Supp. 1082 (D.Colo.1971).

21. 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed. 2d 113 (1971). (See also Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed. 2d 130 (1971).

22. Id. at 376, 91 S.Ct. at 785.

23. Id. at 388, 91 S.Ct. at 788.

24. Justices Black, Douglas and Brennan, 402 U.S. 954, 91 S.Ct. 1624, 29 L.Ed. 2d 124.

25. Mr. Justice Black's dissent from the denial of certiorari in In re Garland, 402 U.S. 956, 91 S.Ct. 1625.

was the lone dissenter in *Boddie*, he feels that if that case is now the law, it should not be limited to divorce. Both Mr. Justice Black and Mr. Justice Douglas would have reversed outright. As Mr. Justice Black said:

"The opinion in Boddie attempts to draw two distinctions between divorce and other disputes. The Court there stated that access to the judicial process in divorce matters is the 'exclusive precondition to the adjustment of a fundamental human relationship.' * * * The two elements then that require open access to the courts are that the judicial mechanism be the 'exclusive' means of resolving the dispute and that the dispute involve 'fundamental' subject matter. The first element—'exclusiveness' of the judicial process as a remedy—is no limitation at all. The States and the Federal Government hold the ultimate power of enforcement in almost every dispute. * * * Thus, the judicial process is the exclusive means through which almost any dispute can ultimately be resolved short of brute force.

The other distinction between divorce and different kinds of controversies suggested in the Boddie opinion is the degree to which the disputes are regarded as 'fundamental.' The extent to which this requirement limits the holding of Boddie is found in the very facts of that decision—the right to seek a divorce is simply not very 'fundamental' in the hierarchy of disputes. * * * And since Boddie held that the right to a divorce was 'fundamental,' I can only conclude that almost every other kind of legally enforceable right is also fundamental to our society. * * * Even the need to be on the welfare rolls or to file for a discharge in bankruptcy seems to me to be more 'fundamental' than a person's right to seek a divorce. * * * For this Court to have first provided for governmental assumption of civil court costs in a divorce case seems to me a most unfortunate point of departure. But since that step has now been taken, I would either overrule Boddie at once or extend the benefits of government paid costs to other civil litigants whose interests are at least as important to an orderly society." [26]

Mr. Justice Douglas, relying on the Equal Protection Clause as he did in Boddie, stated:

"Today's decisions underscore the difficulties with the Boddie approach. In Boddie the majority found marriage and its dissolution to be so fundamental as to require allowing indigents access to divorce court without costs. When indigency is involved I do not think there is a hierarchy of interests. Marriage and its dissolution are of course fundamental. * * * *Similarly obtaining a fresh start in life through bankruptcy proceedings or securing adequate housing and the other procedures in these cases violate the Equal Protection Clause* * * *.[27] (Emphasis added).

■ This Court can only agree that a proper interpretation of *Boddie* requires that, as applied to petitioner herein, the statutory requirement of prepayment of a filing fee to obtain a discharge in bankruptcy violates his Fifth Amendment right of due process, including equal protection. In so concluding, this Court notes its disagreement with the First Circuit's discussion of the constitutional issues in *Garland*. There the Court treated the question not as involving access to a civil court but rather as involving an individual's right to a bankruptcy discharge. Such right, the Court decided, was not a "fundamental right, but a privilege" to which Congress may attach reasonable conditions. In light of *Boddie*, it is difficult to accept this rationale. Perhaps the *Garland* Court treated the question in this manner because it looked upon the filing fee as being "primarily for services for the

---

26. Id.

27. Id. at 961, 91 S.Ct. at 1627.

benefit of the bankrupt"[28] and because it looked upon bankruptcy "not [as] litigation in the normal understanding of the term, but merely [as] a process under which the bankrupt files a petition, turns over his assets, if any, and awaits the receipt of a discharge."[29] While this is certainly an apt description of the mechanics of a bankruptcy proceeding, this Court finds more convincing the District Court opinion in In re Smith:

" * * * we believe what is at stake here is not simply bankruptcy but access to court. So viewed, the question presented takes on a greater significance, at least for those of us who are trained in the law and who regard the legal system as fundamental to our way of life."[30]

This "greater significance" compels this Court to conclude that the statutory requirement of the payment of filing fees as a condition precedent to obtaining a discharge in bankruptcy is unconstitutional as applied to this petitioner.[31]

In so ruling, this Court accepts the petitioner's affidavit of indigence in the absence of evidence to the contrary. In view of the statement of petitioner's financial condition contained therein,[32] it seems unnecessary to decide whether petitioner need sell any exempt assets to obtain money for filing or whether a more stringent standard be adopted for indigency in the constitutional sense as opposed to the standard applied to § 1915 cases.[33] However, that is not to say that petitioner's status as an indigent will be forever unchallenged. The trustee is charged with the duty of examining the bankrupt.[34] Additionally, as the Court in *Smith* concluded, the Referee's decision should make provision for the survival of petitioner's obligation to pay the filing fee.[35] Thus, the fear expressed in *Garland* ("It is easy for him to deny [having sufficient funds to pay the fee], and difficult to prove otherwise. * * * [A] very substantial number of persons who could in fact pay, will avoid doing so")[36] can be minimized. Moreover, the same problem exists in the other areas of civil litigation where § 1915(a) applies. There is no justification for allowing the mere potential for abuse to control in the constitutional area.

Secondly, this leads to a basic objection to allowing petitioner to file—the Government's fiscal interest in supporting the bankruptcy system. The petitioner in *Garland* estimated that allowing filing without payment of fees would

---

28. 428 F.2d 1185, 1187.

29. Id.

30. 323 F.Supp. 1082, 1087; *see also* Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

31. In their brief, the Government cites the case of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) for the proposition that Congress may constitutionally decide to provide benefits only to those persons who pay costs related to the benefit granted, such as discharge of debts. Reliance on the *Cohen* case is misplaced. The *Cohen* case considered the constitutionality of a statute on its face; this case involves a statute only as it applies to this petitioner. See also *Boddie*, n. 9.

32. Petitioner's affidavit states that "[t]he sole assets which I possess are $50 worth of essential household goods and wearing apparel which are exempt from distribution in bankruptcy pursuant to 11 U.S.C. § 24 and CPLR § 5205. I also have a couch in storage on which are owed payments of $6 per month and which has negligible market value."

33. See the thorough discussion of indigency in In re Smith, *supra*, 323 F.Supp. at 1091–1093.

34. 11 U.S.C. § 75(a).

35. The full statement of the *Smith* court on this point reads: "We think it would be constitutionally permissible, and also appropriate, for the referee, at the final disposition of this case, to fashion an order resembling a judgment for costs, which order would provide that petitioner's obligation to pay the filing fee is not permanently discharged but would arise again if and when she is no longer indigent and can pay the fee without undue hardship." (323 F.Supp. 1082, 1093).

36. 428 F.2d 1185, 1188.

result in a revenue loss of $3,000,000 annually.[37] Such a loss would certainly be at odds with the self-financing arrangement of the bankruptcy system. Yet, it is noteworthy that since 1966 that system has not been self-financing. The most recent figures reveal that for the 1970 fiscal year, the deficit in the Referees' Salary and Expense Fund amounted to $4,531,466, twice that of the deficit of the previous year.[38] The apparent difficulty, if not impossibility, of keeping the system current prompted the Judicial Conference to conclude that the principle of a self-supporting bankruptcy system is out-moded and should be abandoned.[39] The Director was authorized to draft an amendment to 11 U.S.C. § 68 to abolish the self-supporting aspect of the system. With the self-supporting feature of the bankruptcy system in jeopardy under the present fee schedule, it is clear that either those fees will have to be raised substantially or society in general will be required to bear a larger burden of the costs of the bankruptcy system. With the filing fees in bankruptcy already greater than the fees in other civil litigation in the federal courts, the latter alternative seems the wiser. However, it is not for this Court to predict the outcome of future changes in the bankruptcy system. Rather, it is this Court's conclusion that the Government's fiscal interest in the filing fee requirement is not a compelling interest. Such conclusion is supported by Mr. Justice Harlan's statement in *Boddie*:

"In our opinion, none of these considerations [including the state's interest in allocating its financial resources] is sufficient to override the interest of these plaintiff-appellants in having access to the only avenue open for dissolving their allegedly untenable marriages." [40]

In requiring adherence to the compelling interest standard, this Court is not unmindful of the Government's argument that the less stringent "reasonable basis" test should be employed. However, like the *Smith* court, this Court holds the Government to the more stringent equal protection test, the compelling government interest test, as enunciated by the Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In *Shapiro*, Justice Brennan held that where a fundamental right is involved, the constitutionality of the statute in question "must be judged by the stricter standard of whether it promotes a compelling state interest." [41] This Court agrees with the court in the *Smith* case that what is at stake here is not simply bankruptcy but access to court, a fundamental interest. Moreover, this Court is moved to its conclusion by the language of Justice Black dissenting from the denial of certiorari in the *Garland* case. He stated, with reference to the *Boddie* case, that:

"Even the need to * * * file for a discharge in bankruptcy seems to me to be more '*fundamental*' than a person's right to seek a divorce. * * * And bankruptcy is designed to permit a man to make a new start unhampered by overwhelming debts in hopes of achieving a useful life." (Emphasis added).[42]

Thus, considering the right of access to the court to seek discharge in bankruptcy in light of the Supreme Court's treatment of the right to seek divorce in the *Boddie* case and in light of the reasoning in the *Smith* case, this Court can only conclude that what is at stake here is a fundamental interest requiring compliance with the "compelling government interest" standard.

37. *Cf. Shaeffer, supra*, note 16 at p. 8.

38. 1970 Annual Report of the Director, Administrative Office of the United States Courts, V–16.

39. Report of the Judicial Conference, March 1969, pp. 23–25.

40. 401 U.S. 371, 381, 91 S.Ct. 780, 791, 28 L.Ed.2d 113 (1971).

41. 394 U.S. 618, 638, 89 S.Ct. 1322, 1333.

42. 402 U.S. 958, 91 S.Ct. 1626.

The final justification for the fee requirement comes from the desire to prevent frivolous petitions. Such desire can have no effect on this case, since it is undisputed that the petitioner seeks to file his petition and obtain a discharge in good faith. And, as petitioner points out:

"* * * there is presently in effect a mechanism fully adequate for discouraging frivolous petitions which waste the time of the bankruptcy court—namely, the established principle that the effect of a dismissal of a bankruptcy proceeding for whatever reason bars by res judicata an attempt to have the scheduled debts discharged in any subsequent proceeding." [43]

Accordingly, for the reasons set forth above, it is

Ordered that petitioner's motion for leave to file his petition in bankruptcy without prepayment of any of the filing fees is granted and the Clerk of this Court is directed to accept said petition for filing and to refer the same to a Referee in Bankruptcy without prepayment of any filing fee.

---

43. Petitioner's Memorandum, p. 17.